## Case No. 7,391.

### JOHNSON v. The INDUSTRY.

[Hoff. Op. 488.]

District Court, D. California. July 6, 1868.

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

H. & C. McAllister, for libellant.
W. H. L. Barnes, for claimants.

HOFFMAN, District Judge. The account given by the libellant's witnesses of the alleged salvage service for which this suit is brought is in substance as follows: On the afternoon of Dec. 23, 1867, the British ship Industry was observed by the steamtug Rescue to be rapidly drifting before a violent southeast gale upon Alcatraz Island. The Rescue, after ascertaining that the ship Imperial, which had also been dragging her anchors, required no assistance, proceeded at her utmost speed to the relief of the Industry, and, passing between her and the Island, rounded to under her stern and came up on her starboard or weather bow. The ship lay nearly parallel to the island, and abreast of a point a little to the eastward of its center. Her distance from it is variously stated, but a majority of libellant's witnesses, including the master of the tug, suppose her to have been from two to three ships' lengths from the shore. They also state that she was still drifting, and that the distance between her and the island perceptibly diminished while the tug was passing round her stern. The master of the tug expresses a strong belief that she was drifting when he came alongside. He declines to swear positively to the fact, but he states, and in this he is corroborated by his crew, that his reason for not coming up on her leeward side after rounding to, as would under ordinary circumstances have been most convenient, was the fear that he might be driven on the island. They also state that when the ship was hailed, and inquiry made if she was dragging, it was answered that she was, and that she had two anchors out, with 60 fathoms chain on one, and 75 on the other. The master of the tug then held up his hawser as a sign to the men on the Industry to send one on board, and having learnt from their gestures that they had none, or that it was below, a heaving line was thrown from the tug, and a hawser from the latter drawn on board by the persons on the Industry, four in number, with great eagerness and extraordinary rapidity. The tug then commenced towing the ship, but so difficult and doubtful was the operation that the master frequently expressed his despair of success, and an axe was brought up and placed near the towing post, in readiness to cut the hawser at a moment's notice. The gale which had for some hours been blowing was of almost unprecedented violence. Its force was so great that it was at times difficult, if not impossible, to stand upright on the deck of the tug, unprotected except by a log gunwale about eighteen inches in height. The motion of the small vessel in the rough sea exposed the crew to the danger of losing their balance and falling overboard; and on one occasion, the master, and on another, one of the men, would have gone overboard, had they not been seized and drawn in.

Under these circumstances the tug succeeded in towing the vessel, with both anchors down, around the easterly end of the island, and slightly under its lee, a distance of from four to six hundred yards, when the hawser parted, and the vessel swung to the flood tide. The master of the tug then ordered up a large hawser from below, and endeavored to induce the Industry's men to take the heaving line and haul the hawser on board. This they persistently refused to do, telling him to go to the city and see the master, as the mates on board were unwilling to take further responsibility. After endeavoring for a considerable time to induce the Industry to accept her assistance, the tug left her and proceeded to town. The Industry was at this time, according to the libellant, in no immediate danger. The island had ceased to be under her lee, and the gale had somewhat abated, Her men had therefore, as the master of the tug expresses it, "got over their scare," and were unwilling, in the absence of the master, to take the responsibility of allowing the tug to tow her to the city. It is alleged, however, that the ship was still so near the island that on the turn of the tide she would have been in imminent danger of going ashore on its easterly end. On reaching the city, the master of the tug immediately drove to the residence of one of his owners, and thence to that of Mr. Walker, agent for Lloyd's underwriters. Accompanied by this gentleman, his brother-in-law, and an additional force of twenty men hired for the occasion, the master of the tug returned with her to the Industry. The night was so dark, and the ship lay so near the island, that she was not immediately seen as the tug approached, and apprehensions were felt and expressed that she had gone down. Upon coming alongside, inquiry was made from the Industry if the captain of the latter was on board, and it was replied that he was not, but that the agent for Lloyd's was. A crew

was then put on board the ship, a hawser attached to her foremast, the chain of the port anchor slipped, and a party put on the windlass to heave up her starboard anchor. The tug then took her in tow, and for some hours dragged her in various directions around the harbor while the men were endeavoring to heave in the starboard anchor. Finding this to be impracticable, the starboard chain was slipped at a point about midway between Alcatraz and Meigg's wharf, or about eight hundred yards from the former, and the ship taken to a wharf in the city. The time employed in this last service was about nine hours.

On the part of the claimants it is denied that any salvage service, even of the lowest degree of merit, was rendered. They allege that when the tug arrived, the Industry, though she had previously dragged, had brought up to her starboard anchor, and been riding in safety for more than an hour; that she neither required nor wished any assistance; that it was accepted after much hesitation and delay, and after the heaving line had been thrown to her three times, and then, because her officers, deceived by the false and fraudulent assurances of the master of the tug, supposed that there might be sunken rocks or other unknown danger near, and not because they considered there was any risk of their being driven ashore by the gale. It is also strenuously asserted that the tug at no time broke out the anchor of the ship; that she merely hauled her up to her anchors and to windward of them as far as the chains would permit, and that when brought up by the chains, the ship swung to the flood tide, thus bringing the hawser across her stem, and causing it to part; that her position was in no respect improved, as she had brought up, not abreast the middle, but off the east end of the island; and that in any event she could not have gone ashore upon it on an ebb tide. It is further alleged that on the return of the tug, her aid was accepted and her crew allowed to take charge of the ship, in consequence of the statement of Captain Griffiths that Lloyd's agent was on board and assumed all the responsibility; and, finally, that she was berthed so unskillfully as to cause her some, though not considerable, damage. A great number of witnesses have been produced in support of the allegations of the parties, and the cause has been argued with earnestness and apparent confidence on each side. The testimony is conflicting, not only on points such as estimates of time and distance, where discrepancies might be expected, but as to matters of fact on which it is difficult to believe that either party could be honestly in error, and the determination of which by the court is a task more than usually embarrassing.

Into every salvage service two ingredients necessarily enter, viz.: First, danger to the property salved; and, second, rescue from that danger by the salvors. As it is denied that either of these ingredients existed in the present case, it becomes necessary to ascertain—First, whether at the time the alleged service was rendered the Industry was in peril, and if so to endeavor to appreciate its degree; and, secondly, whether she was saved from the peril by the tug.

I. Was the Industry in any peril at the time the tug reached her; and if so, what was its degree? That the gale was of extraordinary and almost unparalleled violence is beyond dispute. It is so testified by all the witnesses examined on the subject, and it is proved by circumstances. The steamer Orizaba was unable to go to her wharf, but lay to an anchor off Black Point with steam up during the day. The Stockton steamboat broached to, and was obliged to return to the city, and the MacPherson was unable to make her usual landing on the leeward side of Alcatraz. Even the captain of the Industry states that nearly all the vessels he saw dragged their anchors. That the service performed by the tug was arduous and difficult, and not wholly unattended with danger both to the tug and those on board, is also apparent. That the ship had brought up to her anchor when the tug came alongside is also, I think, shown beyond any reasonable doubt. It is so testified by the two mates and carpenter of the Industry being all on board who were examined, by all the numerous witnesses who watched her from Alcatraz, including the commanding officer and Lieutenant Campbell, witnesses for the libellant. The fact may also be gathered from the testimony of the surveyors on board the French transport Euryale, also witnesses for the libellant. They state that they supposed the ship was ashore upon the island from her evident close proximity to it and from the spray that broke over her. Orders were given on the transport to send boats to her assistance, but, before the boats were made ready, the tug was seen making for the vessel, and the orders were countermanded. It is evident from the testimony of these witnesses that they did not suppose the ship was still dragging. Opposed to this is the evidence of the crew of the tug. That of the engineer is too extravagant to merit attention, and the captain is unable to swear positively that the ship continued to drag while he went round her stern. That he thought she was dragging, or liable to drag, may be inferred from his conduct. He came up on her weather instead of her lee bow, unwilling, as he states, to run the risk of placing his vessel between the ship and the island, and he made ready to cut his hawser at a moment's notice. That the reason he assigns was his only motive for going on the weather side may perhaps be doubted, for the situation of the ship required that she should be dragged

off the island and, in some degree, to windward. But, unless we suppose that his frequent expressions of doubts of his ability to save the ship, and his order to bring up the axe, were parts of a comedy he was acting, to be reproduced afterward in court to enhance the merit of his service, we must believe that he thought the vessel in imminent peril of dragging ashore. He also testifies that on coming near the vessel he inquired if she was dragging, and was answered that she was. The fact that he put this inquiry is not easily reconcilable with the statement of some of the men, and particularly the engineer, that she was visibly and rapidly drifting upon the island; and it is possible that the question may have been understood on board the Industry to be whether the ship had been dragging.

I find nothing in the evidence of the crew of the tug, and in the opinion entertained by her master, sufficient to countervail not only the evidence of those on board the Industry, but that of all the numerous witnesses who saw the ship from the island. Both Capt. Fitzgerald and Lieut. Campbell testify that the vessel appeared to have brought up, and they retired to their quarters. Capt. Fitzgerald again came out (but after what interval he does not state), to see if she retained her position. He states that she "probably had drifted a very little," but is not positive of the fact. He remained but a very short time, as he saw the tug approaching. Lieut. Campbell testifies that when he first saw the vessel she was drifting; that she drifted within one hundred or two hundred yards of the island, and brought up. He then returned to his quarters; he was out perhaps ten minutes. He does not mention having seen the tug. It is evident, from the fact that he returned to his quarters, that he supposed the ship had ceased to drift.

Assuming, then, that the vessel had ceased to drift before the tug arrived, the next question is, how long before? The log-book states that the vessel began to drag about 3:30 o'clock, and brought up about 4 o'clock at about a cable's length from the island; that, about 5 o'clock, the Rescue approached, and soon after hove a line on board, which was not accepted. About 6 o'clock, or just before, another line was hove, which was taken for a short tow off until the flood tide made. The protest signed by the master, mates and carpenter is to the same effect. It states very positively that the ship lay to her anchor fully an hour or more before the rescue appeared. If these statements are correct as to the time when the ship brought up, it is, I think, clear, from the evidence, that the tug must have appeared within twenty minutes, or at most, half an hour afterward. That the tug reached the Industry at about twenty minutes after four is established not only by the evidence of Capt. Griffiths and his crew,

but by that of Capts. Porter, Wells and Houseman, who were on board the Euryale, and by that of Capt. Clark, of the Goliah. The fact is also either expressly stated or virtually admitted by Sergeant Green, Corporals Frova and Barr, and Privates Reckel, King and Chase, witnesses for the claimants, on whom the defense chiefly relies. The statement, therefore, of the log-book and protest, that the tug did not arrive until five o'clock, is disproved. It is also clearly shown that the statement in the log-book and protest, that the tug was alongside the vessel an hour before the hawser was taken on board, is a gross, and perhaps wilful, exaggeration. Even Capt. Joy, the principal and most zealous witness for the claimants, stated to Capt. Fitzgerald, that the tug took the vessel away between half past four and five o'clock. On the stand he states that half an hour elapsed from the time the tug came on the port bow until the hawser was attached to the weather bow. Dowie, the carpenter of the Industry, swears that the line was on board the Industry fifteen or twenty minutes after the tug came on the weather bow. Corporal Trevor states that they were talking five or ten minutes before the line was put on board the ship. Corporal Barr testifies that the tug lay off her right bow fifteen or twenty minutes. Private Rechel states that he observed the tug making, as he says, ineffectual attempts to tow the ship for fully half an hour before he left the Post. He was relieved at five, or a few minutes after. Private King testifies that he left the city in the steamboat MacPherson, about three o'clock. As he passed Alcatraz, about ten minutes or a quarter of an hour later, he saw the Industry. On his return, about an hour and a half later, at about five o'clock, as he says, the tug had hold of the ship and was endeavoring to tow her.

If to this evidence, furnished by the claimant's own witnesses, we add that of the master and all the crew of the tug, together with that of Capt. Jones, of the MacPherson, and of Capt. Bromley, of the Paul Pry, the former of whom saw the Industry in tow of the tug at about half past four o'clock, and the latter about four and a quarter o'clock, we may safely conclude that the statements in the protest and log-book, that the tug continued to "play off and on" about the ship until six o'clock, when a line was taken, are wholly unworthy of belief. All the witnesses from Alcatraz examined by the claimants agree in stating that the Industry brought up to her anchor about three quarters to one hour before the tug came. They generally concur, too, in stating the time at which she brought up at fifteen or twenty minutes after three, some three quarters of an hour earlier than the time stated in the log-book and protest and by Corporal Barr. Capt. Houseman, also a witness for claimants, testifies that, in his

opinion, from twenty-five minutes to half an hour elapsed from the time the Industry brought up until the Rescue came alongside. Capt. Harrison estimates the time at three quarters of an hour. Capt. Clark, of the Goliah, at about four o'clock, supposed she was still dragging, but he was not certain. Capt. Fitzgerald, commander at Alcatraz, testifies that he was called to look at the ship between three and half past three o'clock. He found she had brought up. He then returned to his quarters. He afterward went out again. She probably had drifted a very little, but he is not positive. He remained but a few minutes, as he saw the tug approaching. It may also be reasonably inferred, from the testimony of the libellant's witnesses who saw the ship from the Euryale, that she had been brought up to her anchor. They all supposed her ashore, and that the lives of her crew were in danger. This was about four o'clock.

From all the testimony, I think it may safely be concluded that the Industry had brought up to her starboard anchor at least twenty minutes or half an hour before the Rescue reached her. Her distance from the shore is variously stated. A majority of witnesses on both sides concur in estimating it about one hundred fathoms, or about two hundred yards. Her position with reference to the island was much controverted at the hearing. The mates allege that after she brought up they took her bearings. Her fore rigging was in a line with the easterly end of the Alcatraz and the point of Angel Island. To all observers from a distance she seemed to be drifting, or ashore on the island. That she lay parallel with and broadside to the island is stated by all who saw her. Even admitting that the mates obtained the bearings they allege, and there are some discrepancies in their testimony, the island lay directly under her lee. I do not understand that the claimants pretend that if she had continued to drag she would have gone clear or to the eastward of the island. On the contrary, they have sought to establish by several witnesses that the ebb tide would have carried her along the island and past its westerly end. But speculations of this sort are too uncertain and conjectural to be relied on. The ebb tide was nearly spent; the gale blew with great violence; the ship had dragged across the ebb tide before the wind and directly across the island for at least half a mile. She had approached within one hundred fathoms of it and was by all who saw her from the island supposed to be coming on shore until she brought up. The idea that the force of the tide would have carried her along and to the northward and westward, is evidently an afterthought which did not occur to any one who witnessed or participated in the courts.

If the foregoing conclusions are just, it is evident that at the time the Rescue came alongside, the peril to the Industry was not as imminent, nor the immediate destruction so inevitable as the master of the tug and those who observed her from a distance supposed. The fact that she was not reported to the officer of the day at Alcatraz, as the regulations of the post require, and that no preparations were made to save the lives of her crew, shows that she was not considered in immediate and imminent danger. They continued to watch her, however, from the island, evidently with great interest, and the approach of the tug probably dispelled all fears that she might again drag her anchors and go ashore. But, though the degree of peril was not as great as supposed by the libellants, I am unable to believe that the officers of the Industry had the serene sense of entire security which they would now have us believe. They had dragged with forty fathoms on the port chain; they had paid out twenty fathoms more without effect; they had then let go the starboard anchor and given it forty-five fathoms. The vessel continued to drag. They then paid out starboard chain until the 75 fathom shackle was abaft the windlass. The vessel was then brought up. To the last 25 fathoms of her chain her safety was due; and on this was her sole reliance. The vessel was within one hundred fathoms of a lee shore; a storm of unparalleled and as yet unabated violence was raging. It is impossible under such circumstances to say that the vessel was in no danger; and equally impossible to believe that no anxiety for her safety was felt. The officers of the Industry state that the heaving line was thrown three times before it was accepted; and then only through fears inspired by the false representations of Captain Griffiths. In this statement they are contradicted by all the crew of the tug, and by necessary inference, by her captain, although the question was not directly put to him. It is not pretended that Capt. Griffiths spoke of sunken rocks, or expressly mentioned any other form of danger than that which was obvious to all. If he believed the vessel was dragging, or liable to drag, he had no need to invent sunken rocks to inspire apprehensions. The mates now declare that the hawser was taken through fear of hidden danger suggested by the master of the tug, but the protest makes no mention of any such suggestions. From that account it would seem that the aid of the tug was accepted through fear that "a change of tide might be unfavorable to the ship." The evident falsehood of the mates' statement that the tug played around the ship for an hour before the hawser was taken on board, justifies us in discrediting their testimony in other respects. And we have, in addition, the positive testimony of Mr. Walker and Mr. Hewett, gentlemen of unimpeachable character, that the mate, on the morning after the occurrence, admit-

ted that the vessel "was in a precarious position." The mate, unable to deny this admission, attempts an unsatisfactory explanation of his language, by attributing to it a sense improbable in itself and contrary to that in which it was understood by the persons who heard him. Similar declarations of the carpenter are sworn to by several witnesses, and not denied; and all the circumstances of the case render it highly improbable that the aid of the tug was not readily and gladly accepted.

The situation of the ship is described in the protest as follows: "The ship now rode favorably, holding on securely, simply surging with the current and force of sudden increase of the wind, and at times appearing to be nearer the island, and still as she surged back as well off as when she brought up at her anchor." When we consider the violence of the gale, the fact that one anchor was foul, and that she had continued to drag with forty-five fathoms of the chain of the other, that she was within one hundred fathoms of a lee shore, and that night was approaching, it is impossible to believe that a ship in the situation described in the protest, could have been, or have been supposed to be. in the condition of absolute safety now pretended by the claimants.

II. It is denied on the part of the claimants that the services of the tug were of any value whatever to the ship. They contend that she was only towed so far as the chains would permit; that her anchors were not broken out either on the first occasion, or subsequently when the tug returned; and that no steamtug would have power to do so. In some of these assertions the claimants are clearly in error. The port anchor is admitted by the second mate to have been foul; that the ship was not held by it is also admitted. When taken up it was foul, not only with the starboard but with its own chain. The seventy-five fathom shackle of the starboard chain was abaft the windlass. From the water she had therefore about seventy fathoms out. The depth of water was about twenty-one fathoms. Supposing the chain to be hauled taut, the ship could describe a circle of about sixty-six fathoms radius, or one hundred and thirty-two fathoms diameter. Both anchors were found by the lighter man sent to pick them up, at a point distant not less than eight hundred yards from Alcatraz,—the starboard anchor with only thirty fathoms chain. It is evident that this anchor must have been broken out and dragged by the tug to a point distant at least 500 or 600 fathoms from its position when the vessel first brought up. Whether the tug broke out the anchor at the time her first service was rendered can be known with certainty, if the distance between the position of the Industry when the tug took hold of her and her position when the tug left her be ascertained. Captain Fitzgerald testified that he measured on the chart the distance traversed by the Industry in going from her first to her second position. He found it to be five hundred yards. This estimate, he adds, might be fifty or possibly one hundred yards out of the way. Lieutenant Campbell thinks the distance between the two points was over three hundred yards. Boswell, the first mate, says he might have been two or three hundred fathoms off the island when the tug left. Tremble, second mate, says the ship was one or two hundred fathoms from the island when the tug left, and that the distance from where the tug first took hold to the place where the hawser parted was one hundred and fifty fathoms. Captain Joy estimates the distance at from four hundred to five hundred feet. Dowie, the carpenter, estimates the change of position at "one hundred and fifty fathoms, perhaps more—over one hundred fathoms, nearly two hundred." When the ship brought up, it may reasonably be supposed that her anchors were directly to windward, and in the direction (towards Meiggs' wharf) in which she had been dragging. The greatest change of position which could occur without moving her anchors would be, as has been shown, twice sixty-six, or one hundred and thirty-two fathoms. This could only take place provided the ship were hauled directly to windward and up to her anchors, and in the same straight line beyond them. But it is clearly established that the ship was hauled around the end of the island and to leeward; and unless Captain Fitzgerald is wholly in error as to her second position, and as to the point on the island from which he observed her, she could not have reached it unless her anchor had been dragged a considerable distance. In this inquiry I have assumed that seventy fathoms had been paid out on the starboard chain, that is, that the seventy-fifth fathom shackle was abaft the windlass. It is not disputed that when the anchor was taken up only thirty fathoms were attached to it. Forty-five fathoms must, therefore. have been hove in. The witnesses who were at work at the windlass all testify to the great difficulty in getting in the chain. They estimate the number of fathoms obtained at from ten to twenty fathoms. If this be so, there could not have been more than forty-five fathoms on the chain. and such, one or two of them swear, was the carpenter's statement to them at the time.

I think the fair conclusion from all the testimony is, that as it is certain that on her return the tug dragged both anchors of the Industry to a considerable distance, it is in the highest degree probable that she also dragged them when she first took hold; that the position in which she left her was much safer than that in which she found her, the island being no longer directly under her lee. but affording her a partial protection; and that in so doing she performed a meritorious service. The assertions of the officers of the

Industry, that the master of the tug stated on his return, that the agent of Lloyd's would take all further responsibility, do not seem to be sustained by the proofs. They are denied by Capt. Griffiths, and were not heard by Mr. Walker or Mr. Hewett. The former testifies that if any such statement had been made, he would not have suffered it to remain uncontradicted. The merit of the second towage of the vessel it is not easy to estimate. The only peril from which it can be supposed to have extricated the vessel was the danger of swinging ashore on the turn of the tide. But the degree or the existence of this danger depended on the distance of the vessel from the shore, of which it is impossible to form an accurate estimate. It is evident that the mates thought themselves in temporary safety at least, when the tug left, for they finally refused all offers of further assistance. The weather moderated during the night, and it cannot now be known whether on the turn of the tide the vessel would or would not have swung clear of the shore.

On a very attentive examination of the whole case my opinion is that the tug performed a meritorious salvage service; that her master hastened with great alacrity to the relief of a vessel supposed by himself and all who observed her from a distance to be in imminent and extreme peril, both to herself and those on board; that the service was arduous, and not unattended by risk to property and person; and that the master believed then, and probably still believes, that his services were necessary to save the ship from impending and inevitable destruction. On the other hand, I consider it proved that the vessel was not in so great danger as the master of the tug supposed; that her anchors had brought her up twenty minutes or half an hour before the tug arrived; and that it cannot now be affirmed with certainty that she would not have ridden out the gale, which had almost spent its force, with safety; that, by the aid of the tug, she was rescued from all immediate danger, and that, under the circumstances, no prudent master would have declined, and the court should not refuse to compensate, the services of the tug; and that this compensation should be in some degree proportioned, not to the actual peril of the vessel as shown by subsequent events, but to her apparent danger, and the arduousness and risk of the service. The value of the tug was about $60,000 in gold; that of the ship, cargo, and freight about $160,000 in legal tenders. The claim of $60,000 made by the libellant is extravagant and inadmissible. If a reasonable offer of compensation had been made by the claimants, the court would have been justified in rebuking such an exaggerated demand by refusing costs, and perhaps by diminishing the compensation to which the salvors would otherwise have been entitled. But no such offer has been made; on the contrary, the claim-ants have strenuously denied that any compensation whatever is due. They have asserted that their property was in no danger, and that the salvors have in no way contributed to its preservation. They have accused the salvors of being solely animated by a rapacious desire to profit by the distress of others, and of causing their services to be reluctantly accepted through fears inspired by their own fraudulent representations. If one side therefore has sought to exaggerate, the other has in at least an equal degree attempted to belittle the merit of the service, and I see no reason for withholding or reducing the compensation to which the salvors are entitled. I think the sum of $10,000 in legal tenders is, under all the circumstances, a just allowance. For that sum, with costs, a decree will be entered.